UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CATO INSTITUTE and
MACKINAC CENTER FOR PUBLIC POLICY,

                  Plaintiffs,                           Case No. 1:23-cv-11906

v.                                          Honorable Thomas L. Ludington
                                          United States District Judge
MIGUEL CARDONA, et al.,

                  Defendants.

_____/

**ORDER DISMISSING WITHOUT PREJUDICE PLAINTIFFS' COMPLAINT AND
DENYING AS MOOT PLAINTIFF'S *EX PARTE* MOTION FOR A TEMPORARY
RESTRAINING ORDER**

In April 2022, the Department of Education announced a "One Time Account Adjustment," for federal-student-loan borrowers that would provide qualifying borrowers with credit toward student loan forgiveness for periods of prior forbearance. Plaintiffs Cato Institute and Mackinac Center for Public Policy, both non-profit participants in the federal Public Service Loan Forgiveness Program, sued the Department and its officials alleging that the Adjustment violated both the Appropriations Clause of the Constitution and the Administrative Procedure Act. Three days after filing their Complaint, Plaintiffs filed an *ex parte* motion for a temporary restraining order, seeking to prevent the Department from crediting qualifying borrowers' accounts under the Adjustment. But Plaintiffs have not shown a redressable injury caused by Defendants, so their Complaint will be dismissed without prejudice for lacking Article III standing and their Motion will be denied as moot.

**I.**

As of March 2023, the Federal Reserve estimates that the national student loan debt

surpasses $1,774,000,000,000. Melanie Hanson, *Student Loan Debt Statistics*, EDUC. DATA INITIATIVE (last updated July 17, 2023), https://educationdata.org/student-loan-debt-statistics [https://perma.cc/W93Z-CUC6]. Throughout the nation, 45.3 million people have student loan debt and 92% of those people borrow from the federal government. *Id.* The average federal student loan debt is $37,338 per borrower. *Id.*

Title IV of the Higher Education Act of 1965 governs federal student loans. 20 U.S.C. § 1070 *et seq.*; *see also Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).[1] Under federal student loan programs, the federal government loans federal capital directly to borrowers. Alexandra Hegji, Kyle D. Shohfi & Rita R. Zota, Cong. Rsch. Serv., R47196 *Federal Student Loan Debt Cancellation: Policy Considerations* (2022) at 2. Once a loan is issued, a borrower's commitment to repay the loan is an asset of the United States. *See id.* But student loans can be forgiven under two Congressionally authorized loan forgiveness programs: the Income-Driven Repayment (IDR) model and the Public Service Loan Forgiveness (PSLF) Program. *See* 20 U.S.C. §§ 1098e(b) (authorizing IDR forgiveness), 1087e(m) (authorizing PSLF forgiveness).

Under all IDR plans, a borrower's debt will be eventually forgiven, so long as the borrower makes qualifying payments each month, "at an amount . . . intended to be affordable based on [the

---

[1] Given its timeliness and notoriety, it is worth briefly distinguishing why the result in *Biden* does not control the standing analysis that follows. In *Biden*, the Supreme Court held that the Department of Education lacked statutory authority under the Higher Education Relief Opportunities for Students Act of 2003 to establish a new student loan forgiveness program which would have affected nearly all borrowers and forgiven $430 billion of student loan principle. *See Biden*, 143 S. Ct. at 2362, 2375. The *Biden* Court found that Missouri, one of the six state-plaintiffs, had Article III standing to sue because the Department's plan would harm a nonprofit, created by the state of Missouri to participate in the student loan market, by subjecting them to $44 million in fees per year. *Id.* at 2365–68. The Court found the nonprofit's harm was Missouri's harm because the nonprofit was an instrumentality of the state. *Id.* at 2366. But, as discussed *infra* Part IV, Plaintiffs in this case cannot show such concrete particularized injury and, even if they could, Plaintiffs cannot show causation.

student's] income and family size." *Income-Driven Repayment Plans*, FED. STUDENT AID, https://studentaid.gov/manage-loans/repayment/plans/income-driven#monthly-payments (last visited Aug. 8, 2023) [https://perma.cc/9V66-BPSC]. A borrower can choose between four IDR plans, each with specific monthly repayment amounts and forgiveness timelines of either 20 or 25 years. *See* 34 C.F.R. § 685.209(a)–(c); 34 C.F.R § 685.221.

The PSLF Program was enacted in 2007 "to encourage individuals to enter and continue in full-time public service employment." 34 C.F.R. § 685.219(a). The PSLF accomplishes this purpose by forgiving a borrower's student loan balance if the borrower makes 120 monthly qualifying payments while "employed in a public service job."[2] 20 U.S.C § 1087e(m)(1). Qualifying payments include any payments made under an IDR plan or a standard repayment plan. *See* 20 U.S.C § 1087e(m)(1)(A).

As a general matter, loan servicers and lenders can grant borrowers "forbearance" to prevent the borrower's default or to permit the borrower to resume their repayment obligation after default. 34 C.F.R. § 682.211(a)(1). "Forbearance" is defined as "permitting the temporary cessation of payments, allowing an extension of time for making payments, or temporarily accepting smaller payments than previously scheduled." *Id.* As the Department of Education (the Department) warns, forbearance only allows a student to "temporarily stop making payments." *Student Loan Forbearance*, FED. STUDENT AID, https://studentaid.gov/manage-loans/lower-payments/get-temporary-relief/forbearance#request-a-forbearance (last visited Aug. 8, 2023)

---

[2] Defined as "a full-time job in emergency management, government . . . , military service, public safety, law enforcement, public health . . . , public education, social work in a public child or family service agency, public interest law services . . . , early childhood education . . . , public service for individuals with disabilities, public service for the elderly, public library sciences, school-based library sciences and . . . services, or at an organization . . . described in section 501(c)(3) of title 26. . . ." 20 U.S.C § 1087e(m)(3)(i).

[https://perma.cc/S7JG-L569]. A borrower granted forbearance still accrues interest during the forbearance period. *Id.* Importantly, because forbearance temporarily suspends monthly loan payments, periods of forbearance have historically not been credited against a borrower's forgiveness timeline under an IDR plan or the PSLF Program. *See* 34 C.F.R. § 685.219(c)(1)(iii) and 20 USC § 1087e(m)(1)(A) (describing qualifying payments for PSLF); 34 C.F.R. § 682.215(f) (describing the requirements for forgiveness under an IDR plan).  In other words, while a borrower is granted forbearance, they are relieved from the obligation to make monthly payments, but their loans still accrue interest and they cannot progress towards loan forgiveness.

In April 2022, the Department announced "actions to fix longstanding failures" of student loan programs. One such corrective action was a "One-Time Account Adjustment to Count Certain Long-Term Forbearances toward IDR and PSLF Forgiveness" (the Adjustment). U.S. Dep't of Educ. Press Release, Department of Education Announces Actions to Fix Longstanding Failures in Student Loan Programs, Apr. 19, 2022, https://www.ed.gov/news/press-releases/department-education-announces-actions-fix-longstanding-failures-student-loan-programs [https://perma.cc/Z49D-686Q] [hereinafter April Press Release]. The Department based the Adjustment on a "review of past forbearance use" which showed that, "consistent with concerns raised by the Consumer Financial Protection Bureau and state attorneys general," loan servicers "placed borrowers into forbearance in violation of Department rules, even when their monthly payment plan under an IDR plan could have been as low as zero dollars." *Id.* Indeed, the Department noted that "long-term use of forbearance was remarkably widespread." *Id.* More than 13% of borrowers between July 2009 and March 2020 "used forbearance for at least 36 months cumulatively." *Id.* "To mitigate the harms of inappropriate steering into long-term forbearance," the Adjustment "count[s] forbearances of more than 12 months consecutive and more than 36

months cumulative *towards forgiveness under IDR and PSLF*." *Id.* (emphasis added). The Department coupled this Adjustment with a commitment to restrict loan servicers from enrolling borrowers in forbearance by text or email and to regularly audit forbearance use. *Id.* The Department estimated that the Adjustment would result in immediate debt cancellation for at least 40,000 borrowers under PSLF and 3.6 million borrowers would receive at least three years of credit towards IDR forgiveness. *Id.*

On July 14, 2023, the Department, as part of the April 2022 Adjustment, pledged "to Provide 804,000 Borrowers with $39 Billion in Automatic Loan Forgiveness as a Result of Fixes to Income Driven Repayment Plans." 3 U.S. Dep't of Educ., Press Release, Biden-Harris Administration to Provide 804,000 Borrowers with $39 Billion in Automatic Loan Forgiveness as a Result of Fixes to Income Driven Repayment Plans, July 14, 2023, https://www.ed.gov/news/press-releases/biden-harris-administration-provide-804000-borrowers-39-billion-automatic-loan-forgiveness-result-fixes-income-driven-repayment-plans [https://perma.cc/9BGJ-82DQ] [hereinafter July Press Release]. According to the announcement, borrowers would receive notice of automatic forgiveness if they "reached the necessary forgiveness threshold as a result of receiving credit toward IDR forgiveness" for, "any period in which a borrower spent 12 or more consecutive months in forbearance" and "any month in forbearance for borrowers who spent 36 or more cumulative months in forbearance[.]" *Id.* While the July press release focused on IDR plans, payments under any IDR plan qualify as monthly payments to progress toward loan forgiveness under the PSLF Program. *See* 20 U.S.C § 1087e(m)(1)(A). The Department said it would start notifying borrowers immediately if they qualified for the Adjustment. If notified borrowers did not opt out of the Adjustment, their loan discharge would begin 30 days after notification. *See* July Press Release.

On August 4, 2023, Plaintiffs filed a Complaint against the Department, Miguel Cardona in his official capacity as its Secretary, and Richard Cordray in his official capacity as its Chief Operating Officer of Federal Student Aid. ECF No. 1. Plaintiffs Mackinac Center for Public Policy[3] and Cato Institute[4] are both § 501(c)(3) non-profit PSLF qualified employers that allege they regularly compete to recruit and retain employees as beneficiaries of "incentives Congress provided through the PSLF program." *Id.* Plaintiffs allege four counts against Defendants. First, they allege the Adjustment violates the Appropriations Clause within Article 1 of the U.S. Constitution because student loan debt is "money" belonging to the Treasury and the Adjustment "cancels" this student loan debt without Congressional authorization (Count I). *Id.* at PageID.15– 16. Second, they allege Defendants exceeded their statutory authority in violation of the Administrative Procedure Act (APA) by crediting borrowers' periods of forbearance toward IDR forgiveness or the PSLF Program (Count II). *Id.* at PageID.16–18. Third, Plaintiffs allege the

---

[3] Plaintiff Mackinac Center for Public Policy is a "nonprofit research and educational institute that advances the principles of free markets and limited government" by "challeng[ing] government overreach and advocat[ing] for free-market approaches to public policy that free people to realize their potential and dreams." *Our Purpose*, MACKINAC CENT. FOR PUB. POL'Y, https://www.mackinac.org/about (last visited Aug. 11, 2023) [https://perma.cc/9RDM-DDML]. Plaintiff Mackinac Center for Public Policy filed a similar Complaint challenging the Department's pause of monthly payment obligations and interest accrual on federal student loans under the CARES Act in April 2023. *See Mackinac Ctr. for Pub. Pol'y*, No. 1:23-cv-10795 (E.D. Mich. April 6, 2023), ECF No. 1. Cato Institute is not a plaintiff in that litigation, which remains open because the parties twice stipulated to adjourn Defendants' responsive deadline, most recently because of new law effective August 29, 2023, that will likely moot Plaintiff's Complaint. *See Mackinac Ctr. for Pub. Pol'y*, No. 1:23-cv-10795 (E.D. Mich. June 23, 2023), ECF No. 16 at PageID.150; *see also* Pub. L. No. 118-5, § 271, 137 Stat. 10 (June 3, 2023). Notably, the Parties' first stipulation to adjourn noted that Defendants intend to file a motion to dismiss "introduc[ing] new issues, including threshold defenses that implicate this Court's jurisdiction." *Mackinac Ctr. for Pub. Pol'y*, No. 1:23-cv-10795 (E.D. Mich. May 19, 2023), ECF No. 12 at PageID.142.
[4] Plaintiff CATO Institute is "a public policy research organization—or think tank—that creates a presence for and promotes libertarian ideas in policy debates." *About Cato*, CATO INST., https://www.cato.org/about (last visited Aug. 11, 2023) [https://perma.cc/3HLU-YR2H]. Their "mission is to originate, disseminate, and advance solutions based on the principles of individual liberty, limited government, free markets, and peace. *Id.*

adjustment was arbitrary and capricious in violation of the APA (Count III). *Id.* at PageID18–19. Lastly, Plaintiffs allege that Defendants violated the APA by enacting the Adjustment via press release instead of notice and comment rulemaking (Count IV). *Id.* at PageID.19–20.

On August 7, 2023, three days after filing their Complaint, Plaintiffs filed an *ex parte* emergency Motion for a Temporary Restraining Order and Preliminary Injunction. ECF No. 7. Plaintiffs seek "to prevent Defendants [from] implementing the One-Time Account Adjustment, including the cancellation of $39 billion in federal student-loan debt that is scheduled to start on August 13, 2023." *Id.* at PageID.39.

## II.

### A.

*Ex parte* restraining orders are rare remedies, subject to "stringent restrictions." *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974)*.* The stringent restrictions placed on *ex parte* restraining orders "reflect the fact that our entire jurisprudence runs counter to the notion of court action before reasonable notice and an opportunity to be heard has been granted to both sides of a dispute." *Id.*

One "stringent restriction" placed on the availability of *ex parte* temporary restraining orders is Civil Rule 65. *Id.* Under Civil Rule 65(b), a court may issue an *ex parte* TRO only if: (A) specific facts in an affidavit or a verified complaint clearly show immediate and irreparable injury will befall the moving party before the nonmoving party can be heard in opposition; and (B) the movant's attorney certifies in writing efforts made to give notice and the reasons why notice should not be required. FED. R. CIV. P. 65(b)(1). Plaintiffs' compliance with Civil Rule 65(b), and their entitlement to an *ex parte* temporary restraining order on procedural grounds, is questionable.

### B.

Regarding requisite immediate and irreparable injury, Plaintiffs allege that, unless a temporary restraining order is granted, "the Adjustment will unlawfully cancel $39 billion in student loan debt owed to the Treasury *on* August 13, 2023, with over $100 billion more to follow." *See* ECF No. 7 at PageID.49 (emphasis added). But how Plaintiffs arrived at this date is unclear. The Department's July 14, 2023, press release stated only that it would "begin notifying" borrowers via email that they are entitled to discharge for prior forbearance on July 14 and that "discharges [would] begin 30 days after emails [were] sent." *See* July Press Release. The Department further stated that borrowers could opt out of the discharge during their 30-day window, after receiving notice of eligibility. *Id.* Therefore, August 13 is not the deadline Plaintiffs perceive it to be. It is merely the earliest possible point the Adjustment *could* discharge a borrower's debt.

Regarding requisite notice, Plaintiffs allege they were initially unable to serve Defendants with the Complaint on August 4, 2023 because the "clerk's office was closed" but they emailed Defendants a copy of the Complaint on this date and hired a process server. ECF No. 7 at PageID.40. Plaintiffs further claim that a "telephonic conference" was held on August 7, 2023 during which Plaintiffs "explained the nature of the motion and its legal basis" to Defendants. *Id.* But, importantly, Defendants were not served with either the Complaint or the motion for a TRO until the following day. *See* ECF No. 8 (Certificate of Service of Summons); ECF No. 12 (Certificate of Service of *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunction). Indeed, Plaintiffs note that, during the August 7 phone conference, Defendants complained they had "not been served with Plaintiff's Complaint, as required by [Civil Rule] 4(i)." ECF No. 7 at PageID.40

In sum, this Court is skeptical that Plaintiffs have satisfied the procedural requirements to obtain an *ex parte* TRO, as outlined in Civil Rule 65.

### III.

### A.

As a threshold matter, aside from complying with procedural requirements, a plaintiff seeking a TRO must demonstrate Article III standing. Article III standing is "built on a single basic idea—the separation of powers." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *Raines v. Byrd*, 521 U.S. 811, 820, 117 S. Ct. 2312, 2318, 138 L. Ed. 2d 849 (1997). Article III of the Constitution prevents the judiciary from being used to "usurp the powers of the political branches," by confining the federal judicial power to the resolution of "Cases" and "Controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S. Ct. 1138, 1146, 185 L. Ed. 2d 264 (2013). Neither case nor controversy exist unless the plaintiff has standing—a personal stake in the case. *TransUnion*, 141 S. Ct. at 2203; *Raines*, 521 U.S. at 819; *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38 (1976). Article III standing requires the following three elements:

> (1) [the plaintiff] has suffered an 'injury-in-fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 581 (6th Cir. 2016) (quoting *Loren v. Blue Cross* & Blue Shield of Mich., 505 F.3d 598, 606–07 (6th Cir. 2007) and *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000)).

The plaintiff carries the burden of establishing these three elements. *Simpson-Vlach v. Michigan Dep't of Educ.*, 616 F. Supp. 3d 711, 726 (E.D. Mich. 2022), *aff'd*, No. 22–1724, 2023

WL 3347497 (6th Cir. May 10, 2023*); Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 861 (6th

Cir. 2020). Each of these three requirements is "an indispensable part of the plaintiff's case" and

"must be supported in the same way as any other matter on which the plaintiff bears the burden of

proof." *Midwest media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 461 (6th Cir. 2007)

(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

At the pleading stage, the plaintiff must "clearly allege facts that demonstrate each element of

standing." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 386 (6th Cir. 2020) (citing

*Spokeo*, 578 U.S. at 338, 136 S. Ct. at 194).   General or conclusory allegations will not do. *See*

*Simpson-Vlach*, 616 F. Supp 3d at 726; *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531,

544 (6th Cir. 2021).

In order to satisfy the first standing requirement, a plaintiff must show that a concrete injury

"actually exist[s]." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016),

as revised (May 24, 2016) (internal citation omitted). Although standing can exist even when the

alleged injury is difficult to prove or measure, the injury must affect the plaintiff in a personal and

individual way. *See Lujan* 504 U.S. at 560 n.1; *Spokeo*, 578 U.S. at 341–42, 136 S.Ct. 1540;

*Gamboa v. Ford Motor Co.*, 381 F. Supp. 3d 853, 886 (E.D. Mich. 2019). A general harm that

affects the entire citizenry is insufficient.[5]  *Simpson-Vlach* 616 F. Supp. 3d at 724.

---

[5] It is worth noting, here, that Plaintiffs seek nationwide relief for an alleged nationwide injury. *See* ECF No. 7 at PageID.68 (explaining "the injury is not inflicted by agency action toward a plaintiff, but rather by unlawful debt relief for nonparties nationwide. Hence, the injunction must prevent unlawful action as to those nonparties on a nationwide basis.") But the Sixth Circuit is skeptical of such relief. *See Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (C.J. Sutton, concurring) ("At a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government").

Regarding the second standing requirement, causation, a plaintiff will not have standing if the injury "results from the independent action of some third party not before the court." *Id.* at 726; *Gamboa*, 381 F. Supp. 3d at 886; *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 796 (6th Cir. 2009).

To satisfy the third standing requirement of redressability, a plaintiff "must show that each requested remedy will redress some portion of the plaintiff's injury." *Simpson-Vlach* 616 F. Supp. 3d at 726. Further, the remedy must be "limited to the inadequacy that produced [a plaintiff's] injury in fact." *Id.* (quoting *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 540); *Gill v. Whitford*, 138 S. Ct. 1916, 1930, 201 L. Ed. 2d 313 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

## B.

Before addressing Plaintiffs' request for a TRO, this Court must determine whether Plaintiffs have Article III standing to seek relief. That is, this Court must determine whether Plaintiffs have clearly demonstrated injury, causation, and redressability.

### 1.

To establish the first element of Article III standing, Plaintiffs assert two theories of injury: (1) the denial of their procedural right to notice and comment under the APA, and (2) competitive injury. For reasons discussed below, neither theory shows a sufficient concrete, particularized, actual, imminent injury.

#### (i.)

Plaintiffs first argue that they were injured because they were not allowed their "procedural right of notice and comment" under the APA. ECF No. 7 at PageID.55. Plaintiffs cite the Supreme Court's decision in *Summers v. Earth Island Institute* for the proposition that a plaintiff can show a cognizable injury if it has been deprived of a procedural right—such as APA notice and comment

requirements—to protect its concrete interest. ECF No. 7 at PageID.55; *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). But *Summers* said much more. Importantly, the Court in *Summers* stressed that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496. Indeed, the Supreme Court recently reiterated it has "never held a litigant who asserts such [deprivation of a procedural] right is excused from demonstrating that it has a 'concrete interest that is affected by the deprivation[.]'" *Dep't of Educ. v. Brown*, 143 S. Ct. 2343, 2351 (2023) (quoting *Summers*, 555 U.S. at 496–97).

So what concrete interest do the Plaintiffs allege? Plaintiffs claim that the Adjustment, in shortening forgiveness timelines for some PSLF or IDR borrowers, impacts "Plaintiffs' concrete interest in receiving the full benefits to which they are entitled under PSLF." ECF No. 7 at PageID.56. According to Plaintiffs, the Adjustment will "extinguish the incentive for nearly a million student-loan borrowers to seek debt forgiveness through PSLF and thus will disadvantage [Plaintiffs] in the market to recruit and retain" borrowers as employees. ECF No. 1–1 at PageID.24; ECF No. 1–2 at PageID.26. At its core, Plaintiffs argument is that because they are qualified PSLF employers, they have a concrete interest in employing certain PSLF participants and that this interest is impacted by the Adjustment. Plaintiffs rely heavily on a District Court for the District of Columbia case for that proposition.[6] ECF No. 7 at PageID.56–58; *see also Am. Bar Ass'n v. United States Dept. of Ed.*, 370 F. Supp. 3d 1, 13 (D.D.C. 2019).

---

[6] A case from the District Court for the District of Columbia has no binding effect in this Court. *Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 674 (E.D. Mich. 2022) ("[O]pinions that are from neither the Supreme Court nor a circuit court of appeals . . . do not 'warrant' anything in this Court." (quoting *Hillman Power Co. v. On-Site Equip. Maint., Inc.*, 582 F. Supp. 3d 511, 516 (E.D. Mich. 2022)).

But Plaintiffs reliance on *American Bar Association* is not supported by the case. The concrete interests held by the *American Bar Association* plaintiffs are not similarly held by Plaintiffs here. *American Bar Association* involved the Department's decision to strip the American Bar Association (ABA) and other employers of their status as qualifying employers under the PSLF Program. *See Am. Bar Ass'n* 370 F. Supp. 3d at 10. The plaintiffs were the ABA itself, and four law-school graduates enrolled in the PSLF Program, employed by the ABA and other once-qualified public service employers. *Id.* The District Court of the District of Columbia determined that the ABA had standing because the ABA was injured by the Department's decision to eliminate its status as a qualifying PSLF employer. *See id.* Here, Plaintiffs were not similarly stripped of status. On the contrary, Plaintiffs are still PSLF-qualified employers and receive the benefit of that status. The individual *American Bar Association* plaintiffs likewise had standing because they were directly injured when the Department stripped their employers of PSLF status, leaving the individuals with the option of finding new qualifying employment or halting progress toward loan forgiveness. *See id.* at 14–17.  Here, Plaintiffs have not shown any of their employees face such an option.  Plaintiffs' presidents' own declarations do not suggest that any employee was *actually impacted* by the Adjustment. *See* ECF No. 1–1; ECF No. 1–2. Their declarations merely assert that Plaintiffs plan to recruit PSLF participants in the future, some of whom *may* be impacted by the Adjustment. *Id.* This is far too speculative for standing.

In sum, although it appears Defendants did not utilize APA notice-and-comment rulemaking when announcing the Adjustment, Plaintiffs have not shown a "concrete interest" to couple with such a procedural deprivation to establish standing under *Summers.*

**(ii).**

Plaintiffs next turn to the theory of "competitive standing" in attempt to establish an injury to satisfy Article III standing. *See* ECF No. 7 at PageID.57.

The doctrine of competitive standing[7] recognizes that economic actors "suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" against them. *La. Energy & Power Auth. V. FERC,* 141 F.3d 364, 367 (D.C. Cir. 1998); *accord New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002*)*; *see also Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008) (noting that the doctrine of competitor standing "relies on economic logic to conclude that a plaintiff will likely suffer an injury-in-fact when the government acts in a way that increases competition or aids the plaintiff's competitors"). While the "competit[ive] standing doctrine supplies the link between increased competition and tangible injury" it "does not, by itself, supply the link between the challenged conduct and increased competition. The latter must be apparent from the nature of the challenged action itself . . . or from the well-pleaded allegations of the plaintiff's complaint." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023).

A plaintiff seeking to establish completive standing must show (1) that the challenged government action results in "an actual or imminent increase in competition, which . . . will almost certainly cause an injury in fact; *Yellen*, 66 F.4th at 279–80 (quoting *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010) and (2) that the plaintiff is, in fact, "a direct and current competitor" in the market whose "bottom line may be adversely affected by the challenged government action." *Id.*;

---

[7] *See El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995) ("The nub of the 'competitive standing' doctrine is that when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing.").

*KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004); *Mendoza v. Perez*, 754 F.3d 1002, 1013 (D.C. Cir. 2014).

Plaintiffs argue that the PSLF Program evidenced congressional intent to give "public-service employers like Plaintiffs a competitive advantage over private-sector employers" by offering forgiveness inventive to borrowers, and that the Adjustment "necessarily injures . . . Plaintiffs by increasing their labor costs and undermining their recruitment efforts." ECF No. 7 at PageID.58. How? Plaintiffs do not say. They merely make vague and conclusory statements that some "undisclosed" number of borrowers will receive credit toward loan forgiveness for some periods of forbearance. *See id.* at PageID.56, 58.[8] As discussed above, Plaintiffs do not allege that any current employee received Adjustment credit. Plaintiffs cannot allege that they will imminently hire any employee who will have received such credit. *See id.* (noting impacted borrowers are "undisclosed"). Even if Plaintiffs could show that the Adjustment concretely increased their labor costs or decreased the effectiveness of their recruitment efforts, Plaintiffs do not show how this would increase competition and no such increase is obvious. Thus, Plaintiffs' competitive standing argument is inapplicable because they cannot show that the Adjustment results in "an actual or imminent increase in competition, which . . . will almost certainly cause an injury in fact." *Yellen*, 66 F.4th at 279–80 (quoting *Sherley* 610 F.3d at 73).

---

[8] Plaintiffs repeatedly emphasize that the Adjustment will provide borrowers with three years of credit. *See* ECF No. 1 at PageID.39 ("The IDR credits alone are equivalent to cancelling debt equal to 3 years' worth of payments per affected borrower"); ECF No. 7 at Page.ID.58 ("By crediting an undisclosed number of borrowers with at least three years toward PSLF's payment-and-service requirement, the Department has effectively cut PSLF's 10-year requirement to only 7 years.") But only some borrowers affected by the Adjustment receive such a large credit. The Adjustment applies to those borrowers who were granted forbearance for at least 12 consecutive *or* 36 cumulative months, and only this time in forbearance is credited towards the borrower's forgiveness. *See* April Press Release.

In sum, Plaintiffs have not shown an individualized, concrete, and particularized injury-in-fact, so they do not have Article III standing.

**2.**

Even if any of Plaintiffs' hypothetical injuries were sufficiently concrete and particularized for Article III standing purposes, Plaintiffs have not shown that the Adjustment caused their injury. Any of the hypothetical injuries Plaintiffs allege would be caused by Plaintiffs' own employees or prospective employees, not the Adjustment. Thus, there is no causation sufficient for Article III standing. *See Simpson-Vlach*, 616 F. Supp 3d at 726.; *Gamboa*, 381 F. Supp. 3d at 886; *Wuliger*, 567 F.3d at 796 (denying plaintiff standing if the alleged injury "results from the independent action of some third party not before the court.").

Plaintiffs claim that the "traceability" element of Article III standing is "easily satisfied" because "but for" Defendants' unlawful conduct, Plaintiffs' alleged injury would not have occurred. ECF No. 7 at PageID.60. But—even assuming that Plaintiffs' alleged injury was sufficient—they have not adequately demonstrated a causal link between Defendants' action and an identifiable injury.

Plaintiffs complain that, "by crediting an undisclosed number of borrowers with at least three years toward PSLF's payment-and-service requirement, the [Defendants have] effectively cut PSLF's 10-year requirement to only 7 years. But for the forbearance credit, affected PSLF participants must make qualifying monthly payments while working for a public-service employer for an additional three years to earn forgiveness." ECF No. 7 at PageID.59. But Plaintiffs ignore the fact that a borrower is never *required* to continue participation in the PSLF Program or to remain employed by any specific qualified employer. Indeed, although a PSLF participant is required to make 120 qualifying monthly payments while working for a qualified employer for

forgiveness, they need not do so consecutively. *Do I need to make consecutive payments to qualify for Public Service Loan Forgiveness (PSLF)?*, FED. STUDENT AID, https://studentaid.gov/help-center/answers/article/consecutive-payments-to-qualify-for-pslf (last visited Aug. 10, 2023) [https://perma.cc/JVU8-VKSQ]. A borrower who has worked for a PSLF employer for 7 years, making proper monthly qualifying payments, could simply quit, drop PSLF participation, enter the private sector, or switch qualified public employers at any time, regardless of the Adjustment. The inverse is also true. Even those "undisclosed" borrowers offered forbearance credit under the Adjustment could choose to remain employed with their current qualified employer. Indeed, Defendants provided borrowers the ability to opt out of the Adjustment altogether. *See* July Department Press Release.

Far from a "but for" cause of Plaintiff's alleged injury, the Adjustment does no more than offer borrowers who were granted 12 consecutive or 36 cumulative months of forbearance with the option of having that time credited toward their own forgiveness timelines. The injury Plaintiffs allege is not "fairly traceable" to Defendant's Adjustment. If anything, the injury is fairly traceable to the decisions of individual borrowers, independent third parties to this case. Thus, Plaintiffs have also not demonstrated causation, the second element for Article III standing.

Because Plaintiffs are unable to establish Article III standing, their Complaint, ECF No. 1, will be dismissed without prejudice and their Motion for a Temporary Restraining Order and Preliminary Injunction, ECF No. 7, will be denied as moot.

**IV.**

Accordingly, it is **ORDERED** that Plaintiffs' Complaint, ECF No. 1, is **DISMISSED WITHOUT PREJUDICE.**

Further, it is **ORDERED** that Plaintiffs' *ex parte* Motion for Temporary Restraining Order and Preliminary Injunction, ECF No. 7, is **DENIED AS MOOT**.

**This is a final order and closes the above-captioned case**.

Dated: August 14, 2023          s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge